## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JOHN G. GREEAR,** | ) | |
| Plaintiff | ) | Civil Action No. 2:21cv00017 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: Pamela Meade Sargent |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | | |

### I. Background and Standard of Review

Plaintiff, John G. Greear, ("Greear"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Greear protectively filed his application for DIB[2] on July 10, 2018, alleging disability as of June 1, 2006, based on arthritis; back, right knee and left shoulder problems; depression; borderline diabetes; thyroid problems; and high blood pressure. (Record, ("R."), at 12, 229-30, 260, 284, 286.) The claim was denied initially and upon reconsideration. (R. at 144-46, 150-54.) Greear then requested a hearing before an administrative law judge, ("ALJ"). (R. at 159-60, 162.)

---

[2] Greear previously filed applications for DIB on June 15, 2006, and September 29, 2008, alleging disability as of August 26, 2005, and August 30, 2008. (R. at 82, 96.) By decisions dated September 3, 2008, and January 25, 2011, the ALJ denied his claims. (R. at 82-92, 96-106.)

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). It is noted that, when *Albright* was decided, the agency "weighed" opinion evidence under different standards. *See* 56 Fed. Reg. 36932-01 at *36960, 1991 WL 142361 (Aug. 1, 1991). Those standards have been superseded by 20 C.F.R. § 404.1520c, which prescribes how to consider persuasiveness of opinion evidence and prior administrative findings on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright. See* Program Operations Manual System, ("POMS"), DI 24503.005, available at http://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 13, 2021) (explaining the categories of evidence).

The ALJ in this case noted he reviewed the previous September 2008 decision and gave it "little weight" because it was less restrictive than warranted by the medical evidence of record. (R. at 24.) The ALJ noted Greear had a sedentary residual functional capacity instead of a light residual functional capacity as found in the previous September 2008 decision. (R. at 24.) The ALJ noted he reviewed the previous January 2011 decision and was giving it "great weight" because a sedentary exertional level was consistent with the medical evidence of record. (R. at 25.)

The ALJ held a hearing on May 6, 2020, at which Greear was represented by counsel. (R. at 39-59.) At this hearing, the ALJ asked Greear's counsel to address the fact that Greear's two prior applications previously had addressed the applicable period of alleged disability. (R. at 46-48.) Greear's counsel acknowledged this fact, but he stated that Greear was requesting that the ALJ reopen his previous applications based on an error on the face of the decisions. (R. at 46.) The ALJ did not rule on these issues at this hearing.

Following the hearing, the ALJ ordered a vocational interrogatory from the vocational expert, Eric David Dennison,[3] the response of which was proffered to Greear's attorney on June 8, 2020. (R. at 12, 63, 313-16, 318-19.) Greear's attorney then requested a supplemental hearing, which was held on October 13, 2020. (R. at 12, 61-78, 321.) At this hearing, Greear's counsel again acknowledged that to hear Greear's claim, the ALJ would need to reopen Greear's previous applications. (R. at 75-77.) Again, the ALJ did not rule on this at the hearing.

By decision dated October 21, 2020, the ALJ denied Greear's claim. (R. at 12-32.) Insofar as Greear had asked that his previous applications be reopened, the ALJ's decision stated that the request was denied. (R. at 12.) The decision then stated that the ALJ had "considered whether res judicata applie[d]" to Greear's claim, and he found that it did not apply because Greear's mental impairments were evaluated prior to changes in the "B" criteria in the Listing of Impairments. *See* 20 C.F.R. Pt.

---

[3] Vocational expert, Asheley Wells, was present and testified at Greear's October 13, 2020, supplemental hearing in Dennison's absence. (R. at 63, 69-75.)

404, Subpt. P, App. 1, §§ 12.04, 12.06 (2021). The ALJ then addressed Greear's claims on the merits.[4]

The ALJ found Greear met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 15.) The ALJ found Greear had not engaged in substantial gainful activity since June 1, 2006,[5] the alleged onset date. (R. at 15.) The ALJ determined that, through the date last insured, Greear had severe impairments, namely degenerative disc disease; thyroid gland disorder; other and unspecified arthropathies; and obesity, but he found Greear did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15, 18.) The ALJ found, through the date last insured, Greear had the residual functional capacity to perform sedentary work,[6] except he could lift and carry items weighing 10 pounds occasionally and less than 10 pounds frequently; he could stand and walk two hours each and could sit for six hours in an eight-hour workday; he required a sit/stand option that allowed him to sit or stand alternatively at will; he could occasionally climb ramps and stairs, balance, kneel, crawl, stoop and crouch; he could never climb ladders, ropes or scaffolds; and he must avoid concentrated exposure to workplace hazards, such as unprotected heights and hazardous

---

[4] Neither party had asserted any error in the ALJ considering Greear's current application on the merits despite the fact that the ALJ denied his request to reopen his prior applications. Therefore, this court will review the decision on the merits.

[5] Therefore, Greear must show he was disabled between June 1, 2006, the alleged onset date, and December 31, 2010, the date last insured, to be eligible for benefits.

[6] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. 20 C.F.R. § 404.1567(a) (2021).

machinery. (R. at 19.) The ALJ found that, through the date last insured, Greear was unable to perform any of his past work. (R. at 30.) Based on Greear's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that, through the date last insured, a significant number of jobs existed in the national economy that Greear could perform, including the job of an ink printer, a stuffer and a dial marker.[7] (R. at 30-31, 314-15.) Thus, the ALJ concluded that Greear was not under a disability as defined by the Act from June 1, 2006, through December 31, 2010, and he was not eligible for DIB benefits. (R. at 32.) *See* 20 C.F.R. § 404.1520(g) (2021).

After the ALJ issued his decision, Greear pursued his administrative appeals, (R. at 224-25, 327-30), but the Appeals Council denied his request for review. (R. at 1-5.) Greear then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2021). This case is before this court on Greear's motion for summary judgment filed October 6, 2021, and the Commissioner's motion for summary judgment filed November 1, 2021.

## *II. Facts*

Greear was born in 1964, (R. at 229), which, on his date last insured, classified him as a "younger person" under 20 C.F.R. § 404.1563(c). Greear has a high school

---

[7] Vocational expert Wells, who was present and testified at Greear's October 2020 supplemental hearing, stated that a hypothetical individual with this residual functional capacity could perform the jobs of an assembler, a weight tester and a lens inserter. (R. at 69-70.) These jobs were identified by vocational expert Dennison in response to the vocational interrogatory. (R. at 313-16.)

education and past work experience as a pipefitter. (R. at 49, 261.) Greear testified that he was approved for state disability retirement in August 2006. (R. at 56.)

In rendering his decision, the ALJ reviewed records Richard J. Milan, Jr., Ph.D., a state agency psychologist; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Dr. Richard Surrusco, M.D., a state agency physician; Dr. Allen Mullins, M.D.; Blue Ridge Neuroscience Center, P.C., ("Blue Ridge"); Holston Medical Group Rehabilitation Center; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Appalachia Family Health Center, ("Center"); Dr. C. Marcus Cooper, Ph.D., a clinical psychologist; and Pain Medicine Associates, P.C.

By way of background, on January 24, 2003, Greear underwent a left L5-S1 hemilaminotomy and diskectomy with complete resolution of symptomatology for approximately eight months. (R. at 402, 435, 782-85.) Due to persistent low back and left lower extremity pain, on September 23, 2004, Greear underwent radiofrequency lesioning of his facet joints at the L3-L4, L4-L5 and L5-S1 levels. (R. at 795, 817-18.) Subsequently, physical therapy failed to resolve Greear's pain, and he was referred for pain management at Pain Medicine Associates, P.C.[8] (R. at 799.) In April 2005, Greear reported Lortab was of some benefit, but his pain persisted such that his sleep and activity were limited. (R. at 790.) Benjamin A. Meeks, F.N.P., a family nurse practitioner with Pain Medicine Associates, recommended dorsal column stimulation. (R. at 790.)

---

[8] Grear continued with pain management through February 2007. (R. at 458-64, 789-800.)

On July 28, 2005, Greear saw C. Marcus Cooper, Ph.D., a clinical psychologist, for a psychological pain evaluation to address any psychological, social or other factors that would possibly inhibit appropriate use of dorsal column stimulation. (R. at 786.) Greear complained of low back pain and left leg pain, stating prolonged sitting or standing, and a lot of activity increased his leg pain. (R. at 786.) Greear stated medication helped with his sleep, depression and agitation. (R. at 786-87.) Greear was fully oriented; he exhibited no thought disorders; he was of average intelligence; he had no significant problems with memory, concentration or judgment; and he exhibited some mild depressive features associated with his complaints of pain. (R. at 786.) The Beck Depression Inventory, ("BDI"), the Beck Anxiety Inventory, ("BAI"), and Pain Patient Profile, ("P-3"), were indicative of Greear having significantly above average depression in comparison to chronic pain patients but below the average range for both anxiety and somatization. (R. at 786-87.) Cooper explained that these results indicated Greear's depressive characteristics were not involved in his pain and symptomatology and needed to be monitored and further addressed. (R. at 786.) Cooper diagnosed adjustment disorder with depressed mood, nicotine dependence and lumbar degenerative disc disease with post laminectomy syndrome, and he did not see any contraindications for either fusion surgeries or dorsal column stimulation. (R. at 787.)

Due to the persistent and progressive nature of his symptomatology, on August 30, 2005, Greear underwent a lumbar fusion, which significantly decreased his back and leg pain, but approximately four weeks following surgery, he began to experience right lower extremity pain. (R. at 352, 362-66, 455-56.) On September 14, 2005, Dr. Ken W. Smith, M.D., a neurologist with Blue Ridge, saw Greear for follow up. (R. at 433-34.) Greear reported his overall condition continued to improve, and his mobility and ambulation had significantly improved since his

surgery. (R. at 433.) Dr. Smith reported Greear was unable to return to work at that time.[9] (R. at 434.) On October 27, 2005, and December 8, 2005, Greear complained of low back pain and bilateral, lower extremity numbness and tingling. (R. at 427-28, 431-32.) Throughout 2006, Greear continued to see Dr. Smith for complaints of low back pain and bilateral, lower extremity pain. (R. at 405-10.)

Based on Greear's complaints of right leg pain and imaging showing a screw installed during his 2005 surgery was possibly compressing a nerve root, Dr. Smith recommended removal of the hardware. (R. at 352, 360.) On May 2, 2006, Greear underwent exploration, effusion and removal of left-sided pedicle screws. (R. at 402, 443-49.) Following this surgery, Greear participated in physical therapy and pain management by way of anti-inflammatories, muscle relaxants, narcotics, medial branch blocks and lumbar epidural steroid injection for his back. (R. at 53, 348, 386-93, 399, 402-03, 451, 797, 806-16.)

On June 5, 2006, Greear saw Dr. Smith and reported 95 percent improvement in his right lower extremity pain and continued improvement in his lumbar pain since his surgery. (R. at 411.) He stated he walked daily for exercise, without difficulties, and had weaned himself from use of the lumbar brace. (R. at 411.) Greear reported Lortab controlled his pain symptoms and, overall, he was pleased with his operative outcome. (R. at 411.) He stated he did not feel he could return to work and planned to file for social security disability. (R. at 411.)

---

[9] Beginning August 26, 2005, through September 21, 2006, Dr. Smith found Greear was unable to return to the heavy demand requirements as a pipefitter and further work-related issues would be discussed pending a satisfactory post-operative recovery. (R. at 407, 410, 413, 416, 419, 423, 426, 429, 432, 434, 438.) On January 11, 2007, Dr. Smith opined Greear could not return to work and noted any ongoing work-related issues would be left to Dr. W. Turney Williams, M.D., a physician with Pain Medicine Associates, P.D., depending on pain control. (R. at 404.) There is no indication in the record that Dr. Williams addressed Greear's work-related abilities.

On July 13, 2006, Greear saw Dr. Allen Mullins, M.D., and complained of left foot tingling and back and joint pain. (R. at 502.) He denied anxiety, depression, panic disorder and insomnia. (R. at 502.) Greear was in no acute distress, and he had no ankle edema. (R. at 502.) Dr. Mullins diagnosed hypothyroidism, degenerative joint disease, back pain and tobacco use. (R. at 502.)

On July 24, 2006, September 21, 2006, and January 11, 2007, Greear saw Dr. Smith and reported low back pain, tingling in his left foot and sleep disturbance. (R. at 403, 405-06, 408-09.) Greear ambulated mildly flexed at the waist and antalgic to the left; he had tenderness of the left lumbar spine; he had moderate paraspinal spasm in the lumbar region; he had limited range of motion of the spine, ribs and pelvis; he had normal muscle tone and strength in the bilateral lower extremities; he was fully oriented; and his mood and affect were appropriate. (R. at 403, 406, 409.) On January 11, 2007, Dr. Smith reported there was no further need for additional surgical intervention and no indication for continued neurosurgical monitoring. (R. at 403.) Dr. Smith completed a Physician's Report[10] for the Virginia Retirement System stating Greear would not be able to return to the heavy demand requirements of a pipefitter. (R. at 804-05.) Dr. Smith reported Greear was diagnosed with lumbar herniated nucleus pulposus, left S1 disc, status post fusion; lumbar radiculopathy left S1 disc, resolved following surgery; low back pain and right lower extremity pain; lumbar degenerative disc disease at the L3-L4, L4-L5 and L5-S1 levels; and lumbar spondylolisthesis, grade 1 of the L5-S1 level, status post fusion. (R. at 804.) Dr. Smith opined Greear was incapacitated for further performance of duty and that the incapacity was likely permanent. (R. at 805.)

---

[10] This Physician's Report is undated; however, Dr. Smith noted his opinion was based on his September 21, 2006, examination. (R. at 804-05.)

On October 18, 2006, Greear saw Dr. Mullins and reported back and joint pain. (R. at 477.) Greear denied anxiety, depression, panic disorder and insomnia. (R. at 477.) His physical examination was normal. (R. at 477.) Despite noting that Greear had no complaints of depression or insomnia, Dr. Mullins included depression and insomnia to his diagnosis. (R. at 477.) It also was noted that Greear's depression was stable. (R. at 477.)

On March 23, 2007, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Greear to provide additional information to assist in the overall processing of his retirement benefits. (R. at 465-73.) Greear reported he consumed alcohol daily and occasionally smoked marijuana to seek pain relief. (R. at 469.) He stated he preferred to "stay away from others" and typically preferred being alone. (R. at 469.) Greear reported he was irritable 50 percent of the time; his memory was fair; his concentration was erratic, and he was often distracted; and he would become jittery, shaky and tremulousness with anxiety. (R. at 469.) Greear displayed no signs of delusional thinking nor evidence of ongoing psychotic processes; he walked with a limp and moved about frequently in his chair in an apparent effort to seek pain relief; he made good eye contact; he was cooperative and friendly; his speech was clear and intelligible; he displayed indications of ongoing anxiety and tension, such as mild tremulousness, fidgetiness in his chair and restlessness; and his mood was anxious with a mixed affect. (R. at 468-69.)

The Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), was administered, and Greear obtained a full-scale IQ score of 85. (R. at 465-66.) The Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"), was administered, indicating Greear had severe depression; he experienced moderate to severe emotional distress characterized by dysphoria, agitation, worry, anhedonia and

depression; he had problems with attention and concentration, memory deficits and poor judgment; and he was uncomfortable around others, which could cause his behavior to be unpredictable and inappropriate. (R. at 471.) Lanthorn diagnosed major depressive disorder, single episode, moderate to severe; anxiety disorder with generalized anxiety due to chronic physical problems and pain; pain disorder associated with both psychological factors and general medical conditions; and rule out alcohol abuse and cannabis abuse. (R. at 472.) Lanthorn opined Greear was unable to return to his former job at that time and for the foreseeable future. (R. at 473.) He reported Greear's psychological problems were severe, noting Greear was the type of individual who was disinclined to acknowledge or be fully aware of the severity of his difficulties due to lack of psychological insight and sophistication. (R. at 473.) Lanthorn reported Greear was depressed, even with current antidepressant medication, and he experienced anxiety, which appeared to be directly related to pain. (R. at 473.)

On April 3, 2007, Greear saw Dr. Mullins for complaints of back pain after he fell in the shower striking his back and shoulder. (R. at 476.) He had tenderness along the thoracic and lumbar spine area, and he had bruising of the spine area and right shoulder. (R. at 476.) Greear received a cortisone shot in his back and shoulder and he was advised to take Aleve, as needed for pain. (R. at 476.) X-rays of Greear's lumbar spine showed post-surgical changes; marked intervertebral disc space narrowing at the L5-S1 level and facet degenerative changes from the L3-L4 and L5-S1 levels. (R. at 480.) X-rays of Greear's thoracic spine showed no fracture or dislocation and his soft tissues were unremarkable. (R. at 481.)

On March 17, 2008, one year since he last saw Dr. Mullins, Greear complained of back pain and requested that Dr. Mullins write a letter to the Social

Security Administration regarding his inability to work. (R. at 475.) Greear denied
anxiety, depression, panic disorder and insomnia. (R. at 475.) Dr. Mullins reported
Greear was in no acute distress, and he had no ankle edema. (R. at 475.)

On October 16, 2008, Greear established care at the Center for chronic
lumbago with occasional radiation down his left lower extremity and depression. (R.
at 511.) Greear reported that he was moody and short-tempered and had pain in his
hip and lower back. (R. at 513.) Greear was in some distress from back pain; his
extremities had no cyanosis, clubbing or edema; his back examination was
unremarkable; and his straight leg raising test was minimally positive on the left
side. (R. at 512.) Dr. Paul Augustine, M.D., diagnosed hypertension, depression,
chronic lumbago and hypothyroidism. (R. at 512.) On October 21, 2008, x-rays of
Greear's lumbar spine showed post-surgical change at the L5-S1 level and
significant degenerative change at the L5-S1. (R. at 514.) On October 29, 2008, Dr.
Augustine wrote a letter to Greear advising him that, while the Center would
continue to provide ongoing medical care, no narcotic prescriptions would be
provided after October 29, 2008. (R. at 508.) On October 30, 2008, Greear stated he
was "doing a lot better." (R. at 510.)

On February 13, 2009, Greear saw Dr. Augustine and reported he was "doing
well" and had no complaints. (R. at 526.) He was alert and oriented, in no distress
and he had normal examination findings. (R. at 526.) Dr. Augustine noted Greear's
depression was stable on his current medication regimen. (R. at 526.) On June 17,
2009, Greear reported arthralgias and arthritis in his proximal interphalangeal joints,
left hand, shoulder and right knee since the weather changed. (R. at 564.) Greear was
in no distress, and he had crepitation of the right knee. (R. at 564.) Dr. Augustine
recommended Greear take ibuprofen and Tylenol for pain. (R. at 564.)

On January 13, 2010, Greear reported shoulder pain with limited range of motion, including not being able to reach above his shoulder. (R. at 558.) He stated he had not taken Paxil because he could not afford it. (R. at 558.) He was alert and oriented in no acute distress; he could abduct his right shoulder, but it was painful when he reached above his head; he could perform the empty can test;[11] he had no tenderness at the subacromial area; and he had tenderness in the front of the shoulder. (R. at 558.) On July 12, 2010, Greear reported his hypertension was stable. (R. at 554.) He was fully oriented and his mood, affect, judgment and insight were normal. (R. at 555.) On October 13, 2010, Greear reported low back pain and stress related to his son's recent overdose. (R. at 551.) His blood pressure reading was 142/80 and he stated his blood pressure readings at home were "ok." (R. at 551.) He was fully oriented and his mood, affect, judgment and insight were normal. (R. at 552.) On November 11, 2010, Greear stated his blood pressure was high due to stress. (R. at 548.) He reported his stressors included financial difficulties, being unable to work and his 24-year-old son still living with him. (R. at 548.) Greear's blood pressure reading was 138/98. (R. at 548.) He was fully oriented and his mood, affect, judgment and insight were normal. (R. at 549.)

On September 28, 2018, Dr. Robert McGuffin, M.D., a state agency physician, stated Greear's functioning for the time period being adjudicated could not be determined due to insufficient evidence. (R. at 122-23.)

On September 28, 2018, Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding

---

[11] The empty can test is a commonly used orthopedic examination test for supraspinatus impingement or integrity of the supraspinatus muscle and tendon. *See* https://physicaltherapyweb.com/empty-can-test-shoulder-orthopedic-examination/ (last visited Aug. 10, 2022).

Greear's depressive, bipolar and related disorders were non-severe. (R. at 123-24.) Milan found there was insufficient evidence to determine Greear's mental functioning abilities. (R. at 124.) On March 22, 2019, Joseph Leizer, Ph.D., a state agency psychologist, completed a PRTF, which mirrored that of Milan, except he found Greear's depressive, bipolar and related disorders, his anxiety and obsessive-compulsive disorders and somatic symptoms and related disorders severe. (R. at 137-38.)

On March 22, 2019, Dr. Richard Surrusco, M.D., a state agency physician, opined there was insufficient evidence to assess Greear's physical limitations prior to his date last insured. (R. at 136-37.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the

Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Greear argues the ALJ's residual functional capacity finding is not supported by substantial evidence. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-9.) Greear argues the ALJ erred by erred by failing to find he suffered from a severe mental impairment. (Plaintiff's Brief at 5-6.) Greear also contends the ALJ failed to properly consider Lanthorn's opinion. (Plaintiff's Brief at 5-6.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security

Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2021) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[12]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2021).

---

[12] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2021). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2021).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2021).[13] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2021).

---

[13] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

Greear argues that the ALJ erred by failing to find that he suffered from a severe mental impairment. (Plaintiff's Brief at 5-6.) The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1522(a) (2021). Basic work-related mental activities include understanding, remembering and carrying out simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1522(b) (2021). Although the Social Security regulations do not define the term "significant," this court previously has held that it must give the word its commonly accepted meanings, among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." 581 F. Supp. at 159.

In evaluating the severity of mental impairments, the ALJ must first determine the degree of functional loss in four areas considered essential to the ability to work: (1) understanding, remembering or applying information; (2) interacting with others; (3) the ability to concentrate, persist or maintain pace; and (4) adapting or managing

oneself. *See* 20 C.F.R. § 404.1520a(c)(3) (2021). These areas are rated on the following five-point scale: none, mild, moderate, marked and extreme. *See* 20 C.F.R. § 404.1520a(c)(4) (2021). The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. *See* 20 C.F.R. § 404.1520a(c)(4). If a claimant's degree of limitation in all these areas is rated as "none" or "mild," the Commissioner generally will find that the claimant's impairment is not "severe" unless the evidence otherwise indicates that there is more than a minimal limitation in the ability to do basic work activities. *See* 20 C.F.R. § 404.1520a(d)(1) (2021).

Here, the ALJ found Greear had no to mild limitations in all four areas. (R. at 15-17.) As the ALJ's decision details, Greear gave a good medical history to his treating providers; he performed activities that required at least some ability to understand, remember and apply information, such as watching television and performing necessary household chores; he did not complain of symptoms related to understanding or memory; he interacted normally with his treating providers; he was pleasant and cooperative; he had no serious deficiencies in eye contact, speech or conversation; he went out in public to grocery shop and socialized with his family; and he had good hygiene. (R. at 16-17.)

In making his findings as to Greear's mental impairments, the ALJ noted he did not find the opinions of Cooper and Lanthorn persuasive because they did not provide a residual functional capacity finding or any limitations and they did not regularly treat Greear. (R. at 26, 28.) The ALJ stated he did not find Lanthorn's March 2007 opinion that Greear was unable to return to his former job at that time or for the foreseeable future persuasive because Lanthorn failed to clarify whether Greear was unable to work as a pipefitter or at other jobs within the national

economy with reduced requirements. (R. at 27-28.) The ALJ also stated that Lanthorn appeared to base his opinion mainly on Greear's self-reports. (R. at 28.) The ALJ stated he did not find state agency psychologist Leizer's March 2019, opinion persuasive because it did not provide a residual functional capacity or any limitations. (R. at 26.)

Based on this, I find that the ALJ did not properly consider the medical opinion evidence regarding the severity of Greear's mental impairment. As stated above, the Social Security regulations now require the ALJ, when evaluating the persuasiveness of medical opinions, to specifically address supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ in his decision did not address either of these factors.

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2021). The ALJ found, through the date last insured, Greear had the residual functional capacity to perform sedentary work, except he could lift and carry items weighing 10 pounds occasionally and less than 10 pounds frequently; he could stand and walk two hours each and could sit for six hours in an eight-hour workday; he required a sit/stand option that allowed him to sit or stand alternatively at will; he could occasionally climb ramps and stairs, balance, kneel, crawl, stoop and crouch; he could never climb ladders, ropes or scaffolds; and he must avoid concentrated exposure to workplace hazards, such as unprotected heights and hazardous machinery. (R. at 19.)

The ALJ stated he did not find Dr. Smith's assessment, which was completed for the Virginia Retirement System persuasive because it was written for the Virginia Retirement System, and it did not provide a residual functional capacity finding or

any detailed limitations. (R. at 27.) Under the revised rules previously discussed, an ALJ "will not provide any analysis" about a decision made by any other government agency or nongovernment entity about whether a claimant is disabled. *See* 20 C.F.R. § 404.1504 (2021). Based on this, I find the ALJ was not required to give this assessment substantial consideration. However, I do not find the ALJ appropriately considered Dr. Smith's opinions dated August 2005 through January 11, 2007.

Beginning August 26, 2005, through September 21, 2006, Dr. Smith opined that Greear was unable to return to the heavy demand requirements as a pipefitter and on January 11, 2007, Dr. Smith opined that Greear was unable to work. The ALJ stated he did not find these opinions persuasive because they did not provide a residual functional capacity or any detailed limitations. (R. at 27.) In addition, the ALJ stated that Dr. Smith did not clarify if Greear "could only not work as a pipefitter" or at other jobs in the national economy. (R. at 27.) Again, in considering the medical opinion evidence, the ALJ did not address either supportability or consistency.

Based on the above, I cannot find that the ALJ properly evaluated the medical opinion evidence, and I recommend the court remand Greear's claim for further consideration.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence does not exist in the record to support

the ALJ's consideration of the medical evidence;

2.      Substantial evidence does not exist in the record to support the ALJ's finding that Greear did not suffer from a severe mental impairment;

3.      Substantial evidence does not exist in the record to support the ALJ's residual functional capacity finding; and

4.      Substantial evidence does not exist in the record to support the Commissioner's finding that, through the date last insured, Greear was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Greear's and the Commissioner's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand Greear's claim to the Commissioner for further development.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also

receive further evidence or recommit the matter to the magistrate judge
with instructions.

Failure to file timely written objections to these proposed findings and
recommendations within 14 days could waive appellate review. At the conclusion
of the 14-day period, the Clerk is directed to transmit the record in this matter to the
Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and
Recommendation to all counsel of record at this time.

DATED:      August 10, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE